666 So.2d 366 (1995)
Marie MAYEUR
v.
Marcus CAMPBELL, Benson Toyota, Inc., Benson Nissan, Inc., and General Motors Acceptance Corporation.
No. 94 CA 2263.
Court of Appeal of Louisiana, First Circuit.
December 12, 1995.
*367 Robert McComiskey, Christopher Gobert, Metairie, for Plaintiff-Appellee-Cross Appellant, Marie Mayeur.
Warren Horn, David L. Bateman, New Orleans, for Defendants-Appellants, Benson Toyota Inc. and Benson Nissan, Inc.
Before GONZALES, PARRO and REDMANN,[1] JJ.
WILLIAM V. REDMANN, Judge Pro Tem.
Two automobile dealers appeal two judgments on jury verdicts against them for damages caused by acts of Marcus Campbell. Campbell was an employee of one when he purported to sell his own mortgaged van to plaintiff, and then of the other when he refinanced his mortgage on that van, ultimately causing a sheriff's sale in foreclosure of the mortgage. Plaintiff cross-appeals for additional attorney's fees and damages for loss of earnings.
The dealers argue that Campbell's acts were not within the course and scope of his employment with either of them; that the judge erred in failing to instruct the jury that an employer is not liable for an employee's acts while deviating from the employment, and that plaintiff is not entitled to double recovery from the two dealers; that the awards were excessive; and that the jury verdict form erred in not providing for the jury to assign percentages of fault to all defendants, including Campbell.
We disagree with the dealers' first three arguments and, while we agree that special verdicts should apportion total damages by percentages among the parties at fault, we find that the jury's verdict answers do evince such an apportionment among the two dealers and the mortgagee (who has paid the *368 judgment against itself and is not a party to this appeal).
We disagree with plaintiff's claim that her damage award should be increased but we do increase her award for attorney's fees because of the work on appeal.
We therefore amend and affirm.

Facts
Plaintiff lived in Folsom, Louisiana, but worked as a sales agent selling to businesses in the New Orleans area. Her employment required a car not over four years old. After her car was wrecked, she had tried to buy a new one, but she could not find credit because of a poor credit history, including bankruptcy.
Advertising by Benson Toyota brought plaintiff to its dealership, after she telephoned to obtain assurance that, despite her bad credit, she would be able to buy a car with a $5,000 down payment. There she met Campbell, whose Benson Toyota business card gave him the title business manager. The jury evidently believed plaintiff's testimony and documentary evidence of one flimflam after another by Campbell during his manoeuvers to sell her, off the first dealer's used car lot, as a "dealer demo," his own Dodge van (on which he owed a mortgage debt). Plaintiff orally agreed to buy the van for $11,800, and she gave Campbell her $5,000 downpayment check to his order, in accordance with his assertion that that was his "perk" and that the dealer would recoup its equity from her monthly payments.
Plaintiff then took the van home, where she read the printed "retail installment contract" that Campbell had had her sign. She found figures very different from her expected remaining balance of $7,000 or so plus tax and interest (after an $11,800 sale on which she paid $5,000). That printed contract (on the dealer's form, supplied by the mortgagee) showed a cash price of $15,194.08. Then, after crediting the $5,000 down payment and adding $8,051.80 other charges, it showed a balance to be financed of $13,245.88 plus finance charges of $4,634.12, making total payments $17,880 and "total sale price" $22,880.
There followed unsuccessful attempts by plaintiff to return the van and get her $5,000 back, and one other unacceptable written proposal by Campbell to her, on a "Benson Toyota/Isuzu, Inc." form, with a price $1,000 higher than she had agreed plus $35.69 "ad valorem (inventory) tax," as if the used van were in the dealer's inventory. Ultimately, plaintiff signed a written "sale and assumption of chattel mortgage," prepared by Campbell, by which Campbell promised to transfer title to her after she paid 39 monthly payments of $302.15 (Campbell's own mortgage debt in full), totalling $11,783 including undisclosed finance charges (with no mention of the $5,000 plaintiff had already paid Campbell). In some of these actions, as in reinforcing the refusal to return plaintiff's $5,000 and in typing the contracts, Campbell had assistance from other members of the dealer's staff.
Campbell was terminated by that dealership, but a month later was employed by Benson Nissan, as a finance and insurance manager. With the power and connections that that position afforded him, and again with clerical assistance from fellow staff members, and with the dealer's own money paying the mortgagee the balance on the old loan, Campbell refinanced (and increased) his own mortgage loan on the vehicle he had purported to sell as a dealer demo to plaintiffa vehicle that he presumably never had at Benson Nissan, although Benson Nissan executed an odometer statement on it in relation to the refinancing by Campbell.
Plaintiff was ignorant of Campbell's machinations, and continued to send the older monthly payment amount of $302.15 to the mortgagee, annotating her checks as payments against the older account number. Both the account number of the new loan and its monthly amount (in addition to its total amount) were different. Campbell for a while sent the $32.55 difference in monthly payments to the mortgagee, who applied both payments to the new account number. The mortgagee's records showed that insurance on the mortgaged van was in the name of plaintiff, Marie Mayeur (the person from whom it long had received and continued to receive the $302.15 monthly payments).
*369 Campbell fell behind, however, in paying the difference between the monthly payments. The mortgagee began collection procedures and, when plaintiff inquired, told her only that there was a problem that they could not discuss with her because it was not her loan and not her van, and that she would have to return the van.
Those three separate behaviors, whether simple torts or tortious breaches of contract or quasi-contractthe failure to transfer title to plaintiff's name, the encumbering of title with a greater mortgage with increased monthly installments, and the mortgagee's intransigent refusal to work out the problems it knew Campbell's refinancing causedcombined to cause the sheriff's seizure and sale of the van. The seizure and sale caused plaintiff considerable upset and embarrassment and deprivation of the transportation necessary for her work, as well as the loss of the vehicle itself.
The jury evaluated plaintiff's damages by answers to interrogatories on a special verdict form prepared by the judge. That form asked for separate amounts of damages, and the jury found Benson Toyota liable for $7,050 for Campbell's fraudulent misrepresentations in the sale; Benson Nissan for $10,575 for Campbell's substandard actions in remortgaging the van to secure his own refinanced debt; and the mortgagee for $5,875 for improper application of plaintiff's payments to the refinanced loan rather than to the original one. The jury also found that those three actions also constituted unfair trade practices within La.R.S. 51:1405 and therefore awarded attorney's fees of $2,250, $3,375, and $1,875 against those defendants under R.S. 51:1409A. Three separate judgments were then entered, one against each defendant, in conformity with the jury's verdicts.

Scope of employment and deviation
No employer hires an employee to injure its customer, much less to flimflam and cheat her for the employee's personal advantage. Yet Campbell was surely acting for Benson Toyota when he first became involved in plaintiff's efforts to buy a car from that dealer. Benson Toyota had hired him for purposes including selling its cars to its customers. He was enabled by it to use its facilities, its financing and sale forms, its personnel and used car lot, to hoodwink plaintiff into believing that she was buying Campbell's "dealer demo."
We conclude that Campbell's actions come within established notions of course and scope of employment, for purposes of employer liability for an employee's tort. An employer is liable when:
the tortious conduct of the [employee is] so closely connected in time, place, and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests. It can thus be regarded as within the scope [footnote omitted] of the [employee's] employment, so that his employer is liable in tort to third persons injured thereby.
LeBrane v. Lewis, 292 So.2d 216, 218 (La. 1974). See also Riley v. Wiseman, 395 So.2d 384, 387 (La.App. 1st Cir.1981), holding an employer liable when an employee's "actions, although personally motivated, were so closely interwoven with his employer's business" that it was a risk attributable to that business.
Similarly at Benson Nissan, Campbell's actions were in all respects so interwoven with and facilitated by the business that Benson Nissan is liable to plaintiff for Campbell's described tortious actions while in its employ.

The jury charge
Although the dealers complain that the judge should have instructed the jury on deviation from employment, the charge given by the judge was not deficient in that respect. It used the LeBrane language quoted above, distinguishing an employee's work-related acts and those entirely extraneous (as in Normand v. City of New Orleans, 363 So.2d 1220 (La.App. 4th Cir.1978), writ denied, 366 So.2d 573 (La.1979)). The charge adequately set forth the applicable law.
The charge also adequately instructed the jury against double recovery, by its painstaking explanation of the language of Civil Code *370 art. 2315 as providing only reparation of fault-caused damages, and nothing more.

Damages
Damages awarded totalled $23,500. The dealers contend they are excessive; plaintiff contends they are inadequate because the trial judge erred in not admitting certain evidence of lost wages, for which item the award should be increased.
We first note that plaintiff did expressly testify that the lack of her vehicle had interfered with her getting to and performing her work. Presumably the jury remembered that inconvenience and damage in reaching its awards for all damages, notwithstanding the trial judge's exclusion, as unpleaded, of certain calculations regarding before-and-after dollar earnings. The $23,500 award far exceeds the maximum value of plaintiff's lost van (ignoring whether she still owed any part of the original $11,800 price[2]). Considering the award as a whole, we cannot say that plaintiff was harmed by the failure to admit that additional evidence relative to her lost earnings during the period necessary to acquire another car.
Nor can we agree with the dealers that the awards were excessive. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), characterizes as "vast" the trier of fact's discretion in fixing general damages. We deem the awards to be within the jury's discretion.
We also do not reduce the $7,500 total award for attorney's fees. (The dealers dispute only the amounts of the awards against them. They do not dispute the jury's finding that Campbell's acts constituted unfair trade practices or their own consequent liability for attorney's fees.) The fundamental measure of attorney's fees is reasonableness, considering the factors set forth by Rules of Professional Conduct, R. 1.5. Our review, noting particularly the factors of time and labor required, the amount involved, and the results obtained, and also the contingent nature of the fee for a client with plaintiff's limited resources and poor credit, supports $7,500 as a reasonable fee for the trial of this matter. We increase that award by $2,000 in view of the work necessary for this appeal.

The form of special verdict
La.C.C.P. art. 1812B provides that the court shall inform the parties of its intended special verdict form (and jury instructions) and give them reasonable opportunity to make objections.
The dealers object on appeal, as they did at trial, to the form's failure to provide for the assessment of fault "against Marcus Campbell separately and apart from Benson Toyota or Benson Nissan, "and for assessment of "fault of third parties with respect to Benson, i.e., GMAC."
In an action against several defendants whose separate faults contribute to causing damage (such as one vehicular collision caused by negligent acts of several drivers), special verdicts should determine total damages, C.C.P. art. 1812C(4), and each defendant's degree of fault, expressed in percentage, art. 1812C(1)(b), to enable the judge to properly formulate the judgment. See Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975; see also Touchard v. Williams, 617 So.2d 885 (La. 1993), interpreting La.C.C. art. 2324B to provide 50% solidarity among multiple tortfeasors.
The dealers' complaint that the verdict did not allow assessment of the fault of Campbell, "separately and apart from" the dealers, does not seem meritorious. We are not aware of any case assessing an employee's fault (e.g., a truck-driver's) separately from that of the employee's own, vicariously liable employer. We do not see much possibility of assigning Campbell less than 100% as to the dealers.[3] In any case, the jury would have to *371 assign some part of Campbell's fault to the two dealers whose employment of Campbell made them vicariously liable. That was in substance done.
Similarly done in substance was the assessment of "fault of third parties with respect to Benson, i.e., GMAC." The dealers argued that the jury might have deemed the mortgagee "perhaps more culpable in the situation." That argument is not persuasive. The jury's awards (about $5,875 against GMAC, but $10,575 and $7,050 against the dealers) show that the jury found each dealer more culpable than GMAC, rather than the contrary.[4]
Despite the dealers' arguably correct theoretical objections, the answers to the special verdict questions make it clear that the awards stem from a jury finding of total damages of $23,500, which the jury divided into separate awards on the basis of the defendants' degrees of fault, precisely translatable into percentages of 30%, 45%, and 25%. The jury evidently apportioned 30% of $23,500 ($7,050) against one dealer, 45% of $23,500 ($10,575) against the other, and 25% of $23,500 ($5,875) against the mortgagee; and the jury also evidently fixed $7,500 as total attorney's fees and apportioned them, too, 30%, 45%, and 25% against the same defendants.

Decree
Each judgment appealed is amended to increase its award of attorney's fees by $1,000 and to cast each dealer for half the costs of this appeal, and each is otherwise affirmed.
NOTES
[1] Judge William V. Redmann, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Plaintiff paid $5,000 cash plus 22 payments, a total of $11,647.30, though obviously not all was principal. Still, it may be doubted that plaintiff owed all 17 remaining installments on the assumption document that was forced upon her by Campbell.
[3] Whether the mortgagee's liability was exclusively vicarious for Campbell's fault is not before us. As to the dealers, the judgments against Campbell in solido with each dealer and the judgment over against Campbell in favor of one (the other did not ask for such a judgment) effectively fixed Campbell's fault at 100%.
[4] Arguably, the judgment against each dealer should have cast it in solido with the other (and the mortgagee) up to 50% of total damages (with appropriate provision for contribution), under C.C. art. 2324B). No party requests that modification.